By the Court:

Fithian, J.
The judgment of the court at Special Term is based solely upon the conclusion of law that the notes and mortgages in suit were void for usury; and the sole question here is whether the findings and parts of findings of the learned justice at Special Term, upon which this conclusion is based, are sustained by the evidence. These findings are all, and each part thereof, excepted to.
I do not deem it necessary to notice the question of fraud at all. For there is not a particle of evidence even tending to show the plaintiff to have had any knowledge of, or connection whatever with, ahy one of the acts or declarations in the evidence charged as false or fraudulent. No witness swears to it. The *159 plaintiff denies all knowledge on the subject, and the court has not found otherwise. The question of usury arises from facts independent of the question of fraud, and would stand with the same force as they now do if the original notes (defendant’s exhibit “ 1”) had been free from any taint of fraud.
The evidence as to the facts out of which the usury is claimed to have arisen is in a narrow compass, and contained in the testimony of three witnesses only, viz.—plaintiff, defendant, and the witness Wolcott. The facts found by the learned justice are substantially and in effect these: That the notes and mortgage in suit arose out of a corrupt and usurious agreement entered into by and between the defendant and the witness Wolcott, whereby the latter, being the owner or controller of the two notes first executed by the defendant, agreed to renew these two notes, and extend and give time of payment of the debt secured by them for such time as the new or renewed notes had to run, on consideration that the defendant would execute and deliver to Wolcott the notes and mortgage in suit, and permit Wolcott to retain $170 out of the money to be realized by a negotiation of such security. That the defendant agreed to this, and did accordingly, and in pursuance thereof, execute and deliver to Wolcott the notes and mortgage in suit, and receive from him the first notes, and permit him to, and he did, retain the $170, all of which was with the corrupt intent of demanding and receiving more than the legal rate of interest. That in all this Wolcott was acting in concert with and for the benefit of himself and McKinney, and that the notes and mortgage in suit being thus a negotiated and delivered security in the hands of Wolcott, tainted with usury, were thus transferred to the plaintiff, in like manner, tainted, and were, therefore, “ void for usury ” in the hands of the latter. These are the substance of the findings of the court, from the fifth to the last finding inclusive. And, indeed, must be so, substantially. For if the notes and mortgage in suit arose, as is claimed by plaintiff, out of a transaction virtually between Feed, the defendant, and Eldridge, the discounter of the notes, through Wolcott the agent, a middle *160 man, in order to raise money to take up these two first notes, or for any other purpose, then no matter how much money Wolcott might have stipulated for or received, it would not be usury as against the party taking the notes and mortgage, and advancing the money thereon, unless he was also a party to the usurious contract. This principle is so familiar, and so well settled, it is unnecessary to cite authorities to sustain it. And so the retaining or taking by Eldridge of the price for searching titles, etc., is not usurious if taken in good faith for that purpose, and not as a “ cover.” And that it was not intended in this case as a cover for usury is virtually conceded. The question recurs then whether there is evidence to support the finding of the learned justice at circuit on the question of usury. And here I do not mean that this court on appeal, is to weigh and balance with nicety to see if peradventure the evidence may not preponderate against the verdict or finding. But, on the contrary, the court should construe the evidence liberally in favor of the finding, and sustain it, if consistently it can be' done. There are, however, certain well-established and elementary principles and rules applicable to investigations of this character, founded on reason and justice, and which should be closely adhered to in such cases. One of these rules is, that a party alleging fraud, usury, or other tortious and quasi criminal conduct against his adversary, should be held to stricter proof in establishing the facts upon which such consequences are to arise than in other cases. That if such charges are sought to be established by inference, the facts or circumstances upon which the inference is based must be proven with entire certainty, and not be left in doubt. And finally, if upon all the facts and circumstances proved on both sides, it is left a balanced case, the party alleging fraud, usury, etc., ought to fail.
With these rules in view, I will briefly examine whether there be any clear and satisfactory evidence to establish the fact upon which the usury is based. And for the present I lay aside the testimony of Wolcott altogether, except as referred to in considering Beed’s testimony, and resort to that of the defendant himself. In the first place, the court at Special Term find and *161 assume that in the negotiation for the execution of the notes in suit, the witness Wolcott either owned, or assumed to own and control himself, the two notes first delivered. I am unable to find anything in Reed’s evidence to sustain this finding, except the fact sworn to by Reed that Wolcott undertook to negotiate about the renewal of them; and, at the close, delivered them up to him. And, although Wolcott denies the last statement, yet conceding both to be true, it is entirely consistent with the statement and evidence of Wolcott that in all that matter he was acting for and at the request of Reed, and as his agent. And the latter is not inconsistent with any of the circumstances of the case. Reed swears that he approached Wolcott on the subject of making some arrangement about the notes.
McKinney was the payee and holder of the notes. They were delivered by Reed to him, and receipted for by McKinney, as collateral for 1,600 shares mining stock, $3.25 per share, “ to be held with the balance of the capital stock in the hands of Marcus Walker, trustee for j?ro rata sales and benefit.”
Again, there is another finding closely connected with the last, and apparently in support of it (fifth finding), that when the two first notes were about becoming due, they were in the possession of Wolcott and McKinney, and for the purpose of inducing Reed to give collateral security, they (W. & McK.) “ led him (Reed) to believe that they had used said notes,” and “ were unable to protect said notes,” and that “ said notes could not be renewed unless collateral security was given,” etc. And further (sixth finding) that Reed believing this, and “ acting under such belief,” and induced thereby, and having “ no notice or knowledge” to the contrary, and there being “no suspicious circumstances to put him on guard or inquiry,” consented to give to him (Wolcott) the notes in suit, etc., in renewal of the first notes. The materiality of this finding is in connecting Wolcott with it. The finding is more than ordinarily particular and specific in all its language, studiously so, and excluding every negative inference.
Yet, when I look for the evidence to sustain such finding, I am unable to discover any whatever so far as Wolcott is concerned, *162 or either of the other parties. Hot alone that it is against the weight of evidence, but it is without any substantial support whatever. If evidence is to be found anywhere to sustain such a finding, it must be in the testimony of Reed; for it is upon him alone that all these alleged facts rest. And on examining his testimony I find nothing to uphold such a finding. Reed does swear that when the two first notes were delivered up to him by Wolcott (as he says they were), he remarked to Wolcott “that is very strange, these notes have not been discounted at all.” And I find no evidence anywhere in the case that any person whomsoever had ever said, or pretended to him, or in the language of the finding, “ led him to believe,” that the notes ever had been “ discounted at all.” On the contrary, I find evidence from his own testimony, satisfactory to me, that he ought not and had no reason to believe any such thing. When the first note was about maturing Reed goes to McKinney, the original payee and holder thereof, to inquire about it. McKinney tells him that Walker, in whose hands McKinney had originally placed the stock, as stated in the receipt Reed held, would “attend to it and pay it.” The next day Reed sees Walker and McKinney together, and informs the former that he had come to “ see about that note of his.” Walker inquires what note, and Reed informs him, and says McKinney had told him to “ come and see about it.” That he (Reed) was not going to pay it when it became due. That it was understood Walker and McKinney were to attend to it. That they must arrange it, pay it or arrange it. Walker said McKinney had not spoken to him about it. He supposed McKinney was going to attend to it; and then proposed that Reed should make two other notes at thirty and sixty days, and he would take them on to Boston and see if “ they ” could not arrange it. The interview then terminated. Whether Reed did or not make and deliver to Walker the two notes here spoken of for thirty and sixty days does not appear. The next day, or the day after, Reed received from Walker (from Boston) a telegram that the notes could not be extended. Whereupon he immediately went to Wolcott, in Hew *163 York, told him he would not pay the notes, for McKinney had agreed to take care of them. Wolcott said “that was just like McKinney, he never does any thing he ought to do.” And then asks Reed if he would give collateral security if he (Wolcott) would get the notes renewed % Keed says, “I don’t object to that.” Whereupon the negotiations commenced, resulting in the giving the notes and mortgages in suit. This is all the evidence on the subject of whether the two first notes were or not previously discounted. Certainly there is nothing there to warrant the charge or sustain a finding such as the fifth or sixth in this case. On the contrary, the evidence is quite convincing that Keed did not even make the inquiry as to who held the notes, but assumed and acted upon the assumption that Walker and McKinney, one or both of them, had the ownership or control of these notes. • It is barely possible that Keed might, in fact, have supposed and believed the notes had been discounted. But when he asks a court of justice, proceeding upon established rules of evidence, to find as a fact, as against an innocent and bona,fide holder of securities, that he was cheated and falsely misled into such belief, and acted solely upon it in making the securities, with no circumstances existing to put him on inquiry to the contrary—he must bring stronger evidence than he has in this case. The fifth and sixth findings, therefore, must fall for want of evidence. And likewise that part of the eighth finding in relation to the inducement under which Keed acted/6 as found in the sixth finding,” is not sustained by any evidence, and must be reversed. The language of the fifth finding (which seems to be one of the centre or pivotal points upon which all the other findings are made to rest) is very peculiar, as well in what it asserts as what it omits. The finding in substance is, that Wolcott and McKinney, with the intent stated of 66 inducing ” Keed to renew the first notes and give 66 collateral security,” not only 66 led him (Reed) to believe that they (W. & McK.) had, in fact, used said notesbut further, 66 that although they (W. & McK.) were making sales, and making money, and working rapidly, yet by reason of the inattention of said Me- *164 Kinney they were then unable to protect said notes, and that said notes could not be renewed unless collateral security was given.” Now what did Wolcott or McKinney say or do to “ lead Keed ” to believe the above ? The finding is silent on that subject. And when I turn to the evidence, there is nothing to support the finding, such as it is. The gist of the finding is that Wolcott, having first falsely induced Reed to suppose the notes had been discounted, for his as well as the others’ benefit, then lied to Reed about the ability of himself and others to take the notes up, by saying that although they were making “ sales and money,” yet McKinney did not attend to the business. This might be an adequate reason to induce Reed to “believe” that McKinney would not take up, or deliver up, the notes. But how it could be any reason for Reed to “ believe ” they could not take up or deliver up the notes, is di 03 cult to understand. If it were true, as Reed, according to the finding, was made to “believe,” that they were “ working .rapidly,” and “ making sales,” and “ making money,” one would suppose that would be a very good reason for “ believing ” they were able (instead of “ unable ”) to take up the notes. So the finding defeats itself in this respect. But an examination of the evidence discloses that all there is in the case to support the whole of this fifth finding is to be found in a single folio, and but little more than a single sentence in Reed’s testimony, at folio 131 of the case. This is it. After testifying to the conversation between him and Wolcott, wherein the latter asked if he would give “ collateral” security, etc., Reed was asked by his counsel this question:
Q. At this time did you call Wolcott’s attention to what had been said at the time of your taking the stock ? It will be observed that the material point in this question was time. The gist of the fifth finding is, that Wolcott, at the time Reed consented to renew and give collateral security, deceived him into believing that the notes were outstanding, and although the enterprise was making money and doing well, yet, by McKinney’s inattention, they were unable to take up the note. As before remarked, all the evidence to be found in support of *165 such finding is contained in the answer to the above question. And that answer is wholly irresponsive and evasive. The question was if, at that specified “ time,” he called Wolcott’s attention to a certain previous conversation? The answer was “ after he said they were mating sales,” etc. This answer may be true in all particulars, and still it wholly fails, in my judgment, to furnish any substantial evidence in support of the fifth finding of fact; and I find no other evidence in the case in any way relating to such finding. It follows, therefore, that the fifteenth finding, so far as it relates to the acts and statements in the fifth and sixth, and part of the eighth finding, is also unsustained by any evidence.
I am at a loss to understand the purpose or intent of the fourteenth finding. If it means (which it does not say) to intimate that Eldridge, the plaintiff, was the attorney or counsel of Wolcott or McKinney in or about any of the matters in controversy in this suit, it suffices to say that there is not a particle of evidence to support it. Mo witness swears or pretends any such thing. If it means merely that in other matters Eldridge was and had been attorney and counsel for Wolcott and McKinney, it is so wholly irrelevant and immaterial, that I fail to see why it should be grafted into the case. I allude to this finding, because it seems to me to characterize the other findings, and indicates to some extent the mode and manner in which the learned justice at Special Term was inclined to and did deal with this evidence. Influenced, as I think, by his well-known abhorrence of all fraudulent practices, he has permitted the evidence as to fraud to be unduly magnified in this case, so as to color and taint the whole evidence, and base upon the fraud (which of itself is not a defense) another and entirely different defense in no way connected with or supported by the fraud.
And this leads me, in conclusion, to consider briefly whether there is any evidence sufficient to show that the witness, Wolcott, was in any way pecuniarily interested in the particular stock sold to Heed by McKinney, or in the two notes received by McKinney therefor, so as to make him (Wolcott), a principal in *166 the transaction of taking from Reed the notes and mortgages in suit. This must be shown in order to make out the defense of usury. For if Wolcott was acting simply to aid and assist Reed in this matter of renewal, or as a middle man between Reed and Eldridge, then the notes and mortgage in suit had no inception in the hands of Wolcott, and as Eldridge took no usury, there is none in the case.
As before remarked, the defendant Reed assumes the burden of establishing, by satisfactory evidence, the fact that Wolcott was interested pecuniarily in the first notes, and acted as principal, and for his own benefit in the negotiation of the notes and mortgages in suit. This fact must be proved, not surmised, and must be established by evidence to the point itself, and not by general accusations or assertions. There is no express finding on this subject, and if there be any evidence in support of the alleged fact, it must be found in the testimony of Reed, for Eldridge and Wolcott swear to the contrary. On a careful examination of Reed’s testimony, I not only fail to find any evidence to show Wolcott a principal, but what seems to me entirely satisfactory evidence to the contrary. Reed swears that McKinney approached him to try and sell him this mining stock; that McKinney represented that he had a gold mine, and that it was a “ splendid mine,” and that he (McK.) “ controlled most of the stock,” and offered to sell Reed 1,500 or 2,000 shares. And on Reed saying he had no money, McKinney offered to take his notes at thirty or forty days, and take them up on their becoming due. Reed thereupon consented to become the purchaser ; and he says “that Wolcott was there and corroborated all these statements, and said that he was interested.” How interested ? In the stock that McKinney was selling % He does not say so, and such is not the necessary inference, for there are various other ways in winch Wolcott could be interested, one of which obviously was as a co-stockholder, with McKinney in the company. And such is not the natural inference ; because the language used shows that it was McKinney individually who was dealing with Reed. He was selling the stock as his own, and *167 proposing to take the notes to himself, and deal with them as his individual property. And this interpretation is sustained fully by the written evidence. The two notes were made payable to the orders of McKinney individually. Reed swears he delivered them to McKinney and took from the latter his written receipt, which is put in evidence. That receipt, when read in the light of the surrounding facts, is conclusive upon the question under consideration. It acknowledges the receipt by McKinney from Reed of the two notes at thirty and forty days; also one hundred shares of the stock of the “ Hardaway Bolt Company,” as security for the payment of the purchase price of 1,600 shares of the capital stock of the “ Gold Hill Mining Company of Colorado,” then and there sold by McKinney to Reed at the price of $3¿ per share. And further, that the 1,600 shares of stock so sold by McKinney to Reed was not to be assigned and delivered to him, but to be placed with all the “balance of the capital stock in the hands of Walker, trustee for pro rata sales and benefits.” From this receipt it is manifest that these parties were not interested in this stock so put into the hands of Walker “trustee, as owners in common and undivided,” but as owners in severalty, each party owning a certain specified number of shares. All of which they had put into a common pool, and the proceeds of the sale of all or any of which were to be divided among these several owners in proportion to the number of shares held by each. And in this view the transaction between McKinney and Reed is clear and apparent. McKinney was carrying in this pool more of this stock than was convenient for him to do. He therefore obtained the consent of his associates that he might (if he could) sell some of his stock to another person, and allow such other person to stand in the pool, as to the stock so sold to him, on the same terms as all the others. Accordingly, McKinney sold out of his own stock the 1,600 shares to Reed, who purchased it, and gave his notes for it, consenting and agreeing that his stock should so remain in the pool. And he (Reed) well knowing and consenting that this stock was to be put oft on to the public, irrespective of *168 whether it had an intrinsic value or not; that a false market-value was to be given to it by fictitious sales among the parties themselves (of whom Reed was one), and that he (Reed) expected to realize the money to pay his notes from what he calls “ dividends” to be made from the proceeds of such sales, and not from any moneys really earned at the mines. That I am not stating this too strongly will appear from Reed’s evidence at folios 123 and 124 of the case, where he swears “they” told him that Walker was to hold the whole of the stock, and they should make “ large monthly dividends from the sales of the stock.” And that “ they ” proposed to buy it and sell it. Hr. Reed, the defendant, is a lawyer, and he must have known what such “ buying and selling” meant. The whole difficulty with this scheme was, that the public was a little more wary and cautious than those parties supposed, and did not take the bait. Hence this lawsuit. And if it were at all necessary to enter into that question, I should feel warranted in affirming and holding that upon the evidence, as it now stands, it would be unsafe to convict either of these parties of a fraud upon Reed. He knew too well the character of the transactions upon which he entered. It was not the representation as to the value of the mine that induced him to act, but the hope and expectation of a successful “ kiting” of the stock.
It suffices, however, to show that the transaction out of which this case has arisen, in its inception, was a matter between Reed and McKinney individually, in which Wolcott had no interest whatever as a principal negotiator.
That such is the true version of the m'atter is made more fully to appear from Reed’s testimony of what took place on the maturity of the first thirty-day note. He goes at once to McKinney about it; McKinney sends him to Walker. He then sees them together, and at once claims to them that they (Walker and McKinney) had agreed to take up these notes, and that he (Reed) would not do it. And it was not until his failure to make any arrangement with these two, that he went to Wolcott. He made no claim upon or charge against Wolcott. As *169 sorting only that McKinney had agreed to take care of these notes, and he Keed “ would not pay them,” it is manifest that Keed did not then claim or pretend that Wolcott was under any obligation to look after these notes, or had any interest in them; but, on the contrary, approached Wolcott as a person interested with him (Keed) and the other parties in a joint speculation or scheme, the success or failure of which was not yet determined, to obtain Wolcott’s assistance to carry along the paper under the hope and belief that moneys would yet "be realized from the sales of the stock, and that Wolcott consented thus to raise money for Keed if he would furnish the security upon which to do it, and therefore Keed did furnish the notes and mortgage in suit. In the hands of Wolcott these securities were the property of Keed, undelivered and unnegotiated, and Wolcott could not have enforced them even if there had been no element of fraud in the case.
Thus, upon Keed’s testimony alone, if it stood uncontradicted, the essential and material fact upon which the defense of usury stands, if at all, is wholly unproved. And when, in addition to that, there appears the positive and unequivocal testimony of two witnesses, speaking from personal knowledge, that such fact did not exist, it is proper, and not disrespectful, to hold that the learned justice at the trial, in the language of the court in Townsend Iron Co. v. Foster (51 Barbour, 351), “ mistook the import and preponderance of the evidence given upon the trial of the cause,” and for that reason the judgment should be reversed, and a new trial ordered, with costs to abide the event.